1

2

3

4

5

6

7

8

9

10

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

11    DANIEL TREGLIA,                    )      No. C 10-5502 LHK (PR)
                                         )
12              Plaintiff,               )      ORDER GRANTING
                                         )      DEFENDANTS' MOTION FOR
13       v.                              )      SUMMARY JUDGMENT;
                                         )      DENYING REMAINING MOTIONS
14    M. C. SAYRE, et al.,               )      AS MOOT
                                         )
15              Defendants.              )
                                         )
16    _____   )      (Docket Nos. 32, 39 & 40)

17

18        Plaintiff, a state prisoner proceeding *pro se*, filed a civil rights complaint pursuant to 42

19   U.S.C. § 1983 alleging that various Pelican Bay State Prison ("PBSP ") medical personnel

20   violated his constitutional rights.  Specifically, Plaintiff alleges that Defendants Dr. M. C. Sayre,

21   Warden Lewis, Dr. Nancy Adam, (incorrectly referred to as "Adams" in the complaint), Nurse

22   Steve Nakamura, Dr. Claire Williams, Nurse Stella Penkian and James Cipolla, (incorrectly

23   referred to as "Sipola" in the complaint), were deliberately indifferent to his serious medical

24   needs in violation of the Eighth Amendment.[1]

25        Defendants have moved for summary judgment.  (Docket no. 32.)  Plaintiff filed his

26

27

28        [1] Defendants Matthew Cate and Glenmark Generics, Inc., were issued summonses on
     February 7, 2011, but no confirmation of service has been received.  (*See* Docket Nos. 5 & 13.)

1    opposition.  Defendants filed their reply.  Having carefully considered the papers submitted, the

2    Court hereby GRANTS Defendants' motion for summary judgment for the reasons set out below.

3

4                                           BACKGROUND[2]

5            Plaintiff claims that he suffered various injuries during his youth, including a shattered

6    foot bone, which has caused him to suffer chronic and severe pain in his foot, knees and back

7    since was he was teenager.[3]  (Compl. ¶¶ 14-26.)  Plaintiff claims that his pain and suffering has

8    gotten much worse since 2005-2006.  (*Id.*, ¶ 27.)  Between January 21, 2007 and May 5, 2009,

9    Plaintiff claims that he has submitted at least thirty-three inmate medical slips for his chronic

10   pain, which included complaints concerning his medication and treatment.  (*Id.*, ¶¶ 30-31.)

11           A.      Plaintiff's Treatment at CSP

12           Plaintiff was incarcerated at California State Prison - Sacramento ("CSP") prior to his

13   transfer to PBSP in June 2009.  Between January 21, 2007 and October 31, 2008, Plaintiff was

14   prescribed Tylenol, Motrin, Rabaxin, Tylenol/Codeine ("Tylenol 3"), Methocarbamoral,

15   morphine sulfate and Elavil.  (*Id.*, ¶ 32.)  On January 10, 2008, Plaintiff was also prescribed and

16   given a backbrace, soft insoles for his shoes, and a high dose of Motrin, which he claims did not

17   help.  (*Id.*, ¶ 33.)  Plaintiff claims that none of the treatment he received during this time was

18   effective in managing his physical pain and suffering.  (*Id.*, ¶ 34.)  Around this time, Plaintiff

19   was diagnosed with chronic back pain.  (*Id.*)

20           On November 14, 2008, Dr. Weddell, who is not a party to this action, discontinued

21   Elavil and ordered that Plaintiff receive physical therapy and 50 mg of Tramadol[4] twice a day.

22   He diagnosed Plaintiff with fybromyalgia.  (*Id.*, ¶ 35.)  Plaintiff also received x-rays of his foot

23

24           [2]  The following facts are undisputed unless otherwise indicated.

25           [3]  The events causing the various injuries include kickboxing training from the age of 5-9,
26   surgery in his tail bone area at age 12, a car accident at age 13, a knife stabbing in his back at age
     14, a second car accident as a teenager, and several fights while Plaintiff was at the California
27   Youth Authority.  (Compl., ¶¶ 14-25.)

28           [4]  The brand name for Tramadol is Ultram.

1  and back which revealed a shattered bone in his left foot.  (*Id.*)  When Plaintiff did not receive

2  physical therapy as ordered, Dr. Weddell put in another request for 180 days of Tramadol and

3  physical therapy.  (*Id.*, ¶ 38.)  Plaintiff claims that the Tramadol helped his pain "a lot."  (*Id.*)

4      On May 22, 2009, Dr. Weddell ordered Plaintiff to see an orthotics specialist for special

5  shoes.  (*Id.*, ¶ 39.)  Plaintiff mentioned to Dr. Weddell that the Tramadol, which had been

6  previously effective, was "not work[ing] anymore."  (*Id.*)  Dr. Weddell told Plaintiff that he

7  would increase the dosage at his next follow up if this continued to be the case.  (*Id.*)

8      B.    Plaintiff's Treatment at PBSP

9      On June 2, 2009, Plaintiff was transferred to PBSP.  (Compl., ¶ 40.)  On the same day,

10  Defendant Dr. Sayre ordered that Plaintiff's prescription for Tramadol be continued for another

11  30 days.  (*Id.*; Mot. for Summ. J. ("Mot."), Ex. A.)  However, Dr. Sayre did not order physical

12  therapy or the orthotics refferal as ordered by Dr. Weddell.

13      On June 7, 2009, Plaintiff submitted a medical slip for his back and left foot because he

14  was experiencing extreme pain and had trouble sleeping.  (Compl., ¶ 41.)  The next day on June

15  8, 2009, Plaintiff was escorted to see Defendant Nurse Nakamura to whom Plaintiff explained

16  his extreme back and foot pain.  (*Id.*, ¶ 42.)  According to Plaintiff, Nurse Nakamura disbelieved

17  Plaintiff's complaints, stating that Plaintiff was "to[o] young to be having those pains."  (*Id.*, ¶

18  43.)  After Plaintiff told him about his past injuries -- a car accident in 1996, a stabbing in 1997,

19  and another car accident in 1998 -- Nurse Nakamura examined Plaintiff's back and foot.  (*Id.*;

20  Mot., Ex. B.)  Plaintiff claims that during the entire examination, Nurse Nakamura was "rude,

21  cocky and disrespectful."  (Compl., ¶¶ 44-46.)  At the end of the examination, Nurse Nakamura

22  put in an order for Plaintiff to see the doctor.  (*Id.*, ¶ 46; Mot., Ex. B.)

23      Plaintiff claims that from June 8, 2009 to June 26, 2009, Nurse Nakamura would give

24  Plaintiff his medication while saying, "'pill call, crybaby.'"  Plaintiff claims that Nurse Nakamura

25  would crush the pills, making them "taste nasty."  (Compl., ¶ 48.)

26      On June 26, 2009, Plaintiff saw Defendant Dr. Adam, and told Dr. Adam that Plaintiff's

27  current prescription for Tramadol was no longer working.  (*Id.*, ¶ 49.)  Plaintiff explained that

28  when he first received Tramadol, he was able to exercise and do 1000 pushups a day as well as

1   back and leg stretches; however, in the past few weeks, he was not able to exercise and only tries

2   to "work out in the cell during the day, when the pain is bearable" but not much.  (*Id.*, ¶ 50.)

3   Plaintiff explained the history of his medical problems, including his back surgery at age 12, two

4   car accidents and the back stabbing.  (*Id.*, ¶ 53.)  When Plaintiff asked for an increase in his

5   Tramadol prescription, Dr. Adam declined to renew the Tramadol and prescribed Motrin instead.

6   (*Id.*; Mot., Ex. C.)  Plaintiff told him that Motrin was not effective, and that if Plaintiff was not

7   going to receive Tramadol, then Plaintiff would like to get physical therapy to help with the pain.

8   (Compl., ¶ 53.)  Plaintiff claims that Dr. Adam's response was "'well you shouldn't come to

9   prison then.'"  (*Id.*)  Dr. Adam scheduled a follow-up in thirty days.  (Mot., Ex. C at 2.)  Plaintiff

10  received his last dose of Tramadol on July 3, 2009.  (Mot. at 6.)

11          From June 26, 2009 to July 6, 2009, Plaintiff claims that Nurse Nakamura continued to

12  make deprecating comments and make "hard core cry baby... sounds."  (*Id.*, ¶ 54.)  Plaintiff also

13  claims that Nurse Nakamura stated that he would "'make sure you don't get Tramadol anymore.'"

14  (*Id.*)

15          On July 6, 2006, Plaintiff submitted a sick call slip.  (*Id.*, ¶ 56.)  Several hours later, he

16  was escorted to see Nurse Nakamura.  (*Id.*)  They had an exchange about each other's rude

17  comments, and Plaintiff threatened to file a lawsuit.  (*Id.*, ¶ 56-57.)  Nurse Nakamura said he

18  would schedule an appointment with a doctor, but advised that him that he would have to wait 5-

19  6 weeks due to the long waitlist.  (*Id.*, ¶ 58.)  Plaintiff asserted that he was in pain and needed

20  help.  (*Id.*)  Dr. Adam was notified of Plaintiff's complaints on the same day, and she prescribed

21  Tylenol 3 for seven days.  (Mot. at 6, Ex. D.)

22          From July 6, 2009 to July 14, 2009, Plaintiff's back and foot pain becamse worse, such

23  that he had trouble getting out of bed and moving.  (*Id.*, ¶ 59.)  Plaintiff claims that during that

24  time, Dr. Adam never took any action nor responded to Plaintiff's complaint.  (*Id.*)  However,

25  Defendants have submitted evidence showing that Dr. Adam renewed the Tylenol 3 on July 13,

26  2009.

27          On July 14, 2009, Plaintiff was in "unbearable pain" and had to "force himself out of bed

28  just to get his food tray."  (*Id.*, ¶ 60.)  After he laid back down, he was in such severe pain that he

1  could not move.  (*Id.*)  When Nurse Nakamura came to his door to give him his Tylenol 3,

2  Plaintiff refused the medication and refused to sign a refusal form.  (Mot. at 7, Ex. E.)  Plaintiff

3  demanded that he be seen by a doctor because he was in such severe pain and was unable to

4  move.  (Compl., ¶ 61.)  Plaintiff claims that when Nurse Nakamura told him to get up and go

5  with him to his office, Plaintiff stated that he was unable to get out of bed.  (*Id.*)  Plaintiff claims

6  that he lay in bed for several hours until he was rushed to the prison hospital in a wheelchair for

7  pain treatment.  (*Id.*, ¶ 62.)  There he was given Tylenol 3 which helped him to walk but did not

8  remove the pain.  (*Id.*, ¶ 63.)

9       On July 17, 2009. Plaintiff was again seen by Dr. Adam.  (*Id.*, ¶ 64.)  Plaintiff claims that

10  he requested that another nurse bring him his medication because Nurse Nakamura always

11  "aggravates" him.  (*Id.*)  Plaintiff also requested a referral to orthotics and physical therapy, but

12  Dr. Adam indicated that she did not believe it was necessary and noted that Plaintiff possessed

13  good exercise ability.  (*Id.*; Mot., Ex. F.)  She directed him to take his Tylenol 3 prescription and

14  ended the examination.  (*Id*.)

15       On August 13, 2009, Plaintiff was transported by ambulance to Sutter Coast Hospital for

16  shortness of breath and throat pain.  Plaintiff had set a fire in his cell by igniting a stack of

17  papers, which he admits doing in order to "make a point."  (Mot. at 7, Ex. G.)  He was evaluated

18  by a psychologist who determined that Plaintiff was not suicidal.  (*Id.*)  From July through

19  September 2009,  Plaintiff claims that he continued to take his prescribed medication which he

20  admits helped his ability to walk but did not completely ease his back and foot pain.  (Compl., ¶

21  65.)

22       On September 16, 2009, Plaintiff requested that his Tylenol 3 medication be renewed, or

23  that he at least be prescribed Tylenol or Motrin.  (Mot., Ex. H.)  Nurse Nakamura told Plaintiff

24  that he would speak with Dr. Adam, and the prescription was renewed the same day.  (*Id.*)

25       On January 5, 2010, Plaintiff saw Nurse Smith-Sayer, who is not a party to this action, in

26  response to his back and foot pain.  (*Id.*, ¶ 66.)  Plaintiff explained his history of past injuries and

27  his current condition.  (*Id.*)  She prescribed Motrin, which Plaintiff accepted although he told her

28  that it "doesn't help."  (*Id.*; Mot., Ex. H.)

On February 25, 2010, Plaintiff saw Defendant Dr. Williams for his back and foot pain. (*Id.*, ¶ 67.) Plaintiff explained to Dr. Williams that the only medication that had been effective was Tramadol. (*Id.*) He also mentioned that Dr. Weddell had ordered physical therapy and a referral to orthotics eight months ago, as well as a continued prescription for Tramadol until Plaintiff received physical therapy. (*Id.*) According to Plaintiff, Dr. Williams replied that the computer did not indicate any such orders, and made no effort to retrieve Plaintiff's medical file when Plaintiff asserted that the information could be found there. (*Id.*) Furthermore, Dr. Williams informed him that Tramadol and other narcotics were not give in the SHU pursuant to the policy from the Chief Medical Officer. (*Id.*, ¶ 69.) Dr. Williams prescribed Naprosyn[5] at 500 mg twice a day for the pain, and ordered x-rays. (*Id.*) According to the medical records, the foot x-ray revealed no significant interval change as compared to previous x-rays taken in April 2009; the spine x-ray was "unremarkable." (Mot., Ex. I.) Plaintiff received his first prescription for Naprosyn on February 25, 2010. (*Id.*, ¶ 76.)

On April 7, 2010, Plaintiff filed an inmate grievance demanding a prescription for Tramadol. (Mot. at 7.) The appeal reviewers found that Tramadol was not medically indicated, and the appeal was denied at the Director's Level. (*Id.*, Ex. K.)

Plaintiff claims that all the Defendants acted with deliberate indifference to serious medical needs when they denied him a prescription for Tramadol, in violation of his Eighth Amendment right against cruel and unusual punishment.

C.    Plaintiff's Treatment with Naprosyn

Plaintiff claims that around 1:00-2:00 p.m. on April 18, 2010, he began having a "massive burn feeling in the 12 o'clock area of his stomach." (Compl., ¶ 80.) Soon after, Plaintiff began spitting up "thick globs of blood." Plaintiff tried to "tough it out" and laid down after drinking lots of water. (*Id.*, ¶ 81.) Plaintiff could not sleep that night due to the stomach pain. (*Id.*)

---

[5] Naprosyn is a brand name for the generic name Naproxen, which is a nonsteroidal anti-inflammatory drug ("NSAID"). (Mot. at 7, n. 1.)

1    The following day, Plaintiff noticed dark looking blood in his stool.  (*Id.*, ¶ 82.)  When he

2    brought it to the attention of the supervising officers, he was directed to submit a medical slip.

3    (*Id.*)  Plaintiff did so, and marked it "emergency."  An unidentified nurse picked it up.  (*Id.*)  He

4    claims that he experienced dizziness, lack of energy and stomach pain during the day.  (*Id.*, ¶

5    84.)

6         The next day on April 20, 2010, Defendant Nurse Penkian saw Plaintiff.  (*Id.*, ¶ 84.)

7    Plaintiff explained his symptoms and requested to see a doctor.  (*Id.*, ¶ 86.)  According to

8    Plaintiff, when Nurse Penkian asked Plaintiff why he did not report his symptoms sooner, he

9    insisted that he explained his condition in the medical slip submitted the day before.  (*Id.*)  Nurse

10   Penkian stated that Plaintiff was experiencing side effects of Naprosyn, and gave him some

11   chewable Alamag tablets.[6]  (*Id.*, ¶ 87.)  She advised him to drink at least eight cups of water

12   daily, to take Sucralfate one hour before taking Naprosyn, and to only take Naprosyn with food.

13   (Mot. at 8, Ex. L.)  Plaintiff claims that although he reported the symptoms on April 19, 2010,

14   Nurse Penkian attempted to cover up the delay in her report.  (*Id.*, ¶ 88.)

15        On April 28, 2010, Plaintiff submitted an inmate grievance complaining that Naprosyn

16   caused cramping and bleeding, and that he would not have taken the medication had he known of

17   the side effects.  (Compl., ¶ 90; Mot. at 8, Ex. M.)  On April 30, 2010, Nurse Penkian provided a

18   two-page printout from a "Physicians Desk Reference Book" which stated the following: "'Alert':

19   Instruct patient not to take more than 600 mg in 24 hours" and "Teach patient signs and

20   symptoms of GI bleeding, including blood in vomit, and black tarry stool.  Tell him to notify

21   prescriber immediately if any of these occur."  (*Id.*, ¶ 90.)  Plaintiff's appeal was denied at all

22   levels of review, with the Director's Level noting that medical personnel followed health care

23   policy and procedures in ordering the Naprosyn.  (Mot., Ex. M.)

24        Plaintiff claims that Defendant Dr. Williams reasonably knew of these side effects and

25   yet ordered Plaintiff to take 1000 mg every 24 hours, which was 400 mg over the limit.  (*Id.*, ¶

26

27        [6] According to Nurse Penkian's notes from the examination, Almaga was prescribed to

28   alleviate the "epigastric burning."  (Mot., Ex. L.)

92.)  Plaintiff claims that this resulted in an overdose that caused him to suffer physical injury.  (*Id.*)  Dr. Williams saw Plaintiff on June 2, 2010, at which time he found nothing objective to substantiate the complaints.  (Mot. at 8, Ex. N.)  Dr. Williams also noted that the x-rays were without any acute changes.  He informed Plaintiff that Tramadol and physical therapy were not appropriate for him, and he ordered Tylenol for the pain.  (*Id.*)

Plaintiff claims that he saw Dr. Williams for the last time on November 17, 2010, at which time he was again told that Dr. Williams was only going to prescrible Tylenol, Motrin or Naprosyn.  (*Id.*, ¶ 93.)

Plaintiff claims that Defendant James Cipolla, as the head pharmacist at PBSP, "knowingly and willfully shipped to Plaintiff a bag of Naproxen, without placing warnings on the pill bag label, of the potential side effects of Naproxen."  (*Id.*, ¶ 78.)

Plaintiff claims that Defendant Glenmark Generics, Inc., USA, "knowingly and willfully sold Naproxen Tablets, to PBSP, without placing a warning of any side effects on the lable, knowing the pills would be consumed by patients at PBSP."  (*Id.*, ¶ 77.)

## MOTION FOR SUMMARY JUDGMENT

I.    <u>Legal Standard</u>

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  But on an issue for which the

1  opposing party will have the burden of proof at trial, the moving party need only point out "that

2  there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

3         Once the moving party meets its initial burden, the nonmoving party must go beyond the

4  pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a

5  genuine issue for trial." Fed. R. Civ. P. 56(e).  The Court is only concerned with disputes over

6  material facts and "factual disputes that are irrelevant or unnecessary will not be counted."

7  *Liberty Lobby*, 477 U.S. at 248.  It is not the task of the Court to scour the record in search of a

8  genuine issue of triable fact.  *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The

9  nonmoving party has the burden of identifying, with reasonable particularity, the evidence that

10  precludes summary judgment.  *Id.*  If the nonmoving party fails to make this showing, "the

11  moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

12         The Court's function on a summary judgment motion is not to make credibility

13  determinations or weigh conflicting evidence with respect to a disputed material fact.  *See T.W.*

14  *Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The evidence

15  must be viewed in the light most favorable to the nonmoving party, and the inferences to be

16  drawn from the facts must be viewed in a light most favorable to the nonmoving party.  *See id.* at

17  631.

18  II.    <u>Evidence Considered</u>

19         A district court may only consider admissible evidence in ruling on a motion for

20  summary judgment.  *See* Fed. R. Civ. P. 56(e); *Orr v. Bank of America*, 285 F.3d 764, 773 (9th

21  Cir. 2002).     In support of Defendants' motions for summary judgment, declarations have been

22  filed by Defendants Dr. Michael Sayre and Dr. Claire Williams and by Valerie Ly, Defendants'

23  counsel, with supporting exhibits.  *See* Fed. R. Civ. P. 56(c).

24         Plaintiff has verified his complaint and opposition by signing them under "penalty of

25  perjury."[7]

26

27       [7]  Plaintiff thereafter filed an "addendum to his opposition," (Docket no. 37) and another

28  brief, (Docket no. 44).  The addendum was not signed under "penalty of perjury."  The additional
brief, filed in response to Defendants' reply, will not be considered because the Court ordered

1    III.    Eighth Amendment Claims

2            Deliberate indifference to a prisoner's serious medical needs violates the Eighth

3    Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  A prison official violates the Eighth

4    Amendment only when two requirements are met: (1) the deprivation alleged is, objectively,

5    sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's

6    health or safety.  *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

7            A "serious" medical need exists if the failure to treat a prisoner's condition could result in

8    further significant injury or the "unnecessary and wanton infliction of pain."  *Id.*  The following

9    are examples of indications that a prisoner has a "serious" need for medical treatment: the

10   existence of an injury that a reasonable doctor or patient would find important and worthy of

11   comment or treatment; the presence of a medical condition that significantly affects an

12   individual's daily activities; or the existence of chronic and substantial pain. *McGuckin v. Smith*,

13   974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds*, *WMX Technologies, Inc. v.*

14   *Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

15           A prison official exhibits deliberate indifference when he knows of and disregards a

16   substantial risk of serious harm to inmate health.  *See Farmer*, 511 U.S. at 837.  The official

17   must both know of "facts from which the inference could be drawn" that an excessive risk of

18   harm exists, and he must actually draw that inference.  *Id.*  "A difference of opinion between a

19   prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983

20   claim." *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981).  Where doctors have chosen

21   one course of action and a prisoner-plaintiff contends that they should have chosen another

22   course of action, the plaintiff "must show that the course of treatment the doctors chose was

23   medically unacceptable under the circumstances, . . . and the plaintiff must show that they chose

24   this course in conscious disregard of an excessive risk to plaintiff's health."  *Jackson v.*

25   *McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (internal citations omitted).

26   _____

27   that the matter would be deemed submitted upon the filing of Defendants' reply.  (*See* Docket

28   No. 4 at 4, ¶ 5. )

A.      Failure to Prescribe Tramadol

Even assuming that Plaintiff had a serious medical condition, there is an absence of evidence that Defendants Dr. Adam, Dr. Williams, and Nurse Nakamura knew that Plaintiff faced a substantial risk of harm, and consciously disregarded it by failing to take reasonable steps to abate it. *See Farmer*, 511 U.S. 825, 837 (1994). There is no dispute that Defendants provided medication in response to Plaintiff's complaints of pain: Plaintiff was prescribed Tylenol 3, Motrin and Naprosyn. *See supra* at 4-6. The main issue stems from the fact that the parties differ in opinion as to which pain medication was appropriate. However, a difference in opinion between Plaintiff and Defendants regarding his treatment does not give rise to a § 1983 claim. *See Franklin*, 662 F.2d at 1344. Furthermore, to overcome this presumption, Plaintiff must show that "the course of treatment [Defendants] chose was medically unacceptable under the circumstances" and that they chose "this course in conscious disregard of an excessive risk to [P]laintiff's health." *Jackson*, 90 F.3d at 332. On the contrary, the evidence shows that discontinuing Tramadol was based on concerns for Plaintiff's health, and that per CDCR policy, "nonformulary, chronic use of Tramadol is not recommended to all inmates." (M. Sayre Decl., ¶ 4.) Dr. Sayre states in his declaration in support of Defendants' Motion for Summary Judgment that "long-term prescriptions for Tramadol are discouraged" for multiple reasons including "addiction, dependence, euphoric effects, and correctional appropriateness." (*Id.*) Dr. Sayre states that in his medical opinion, continuing Plaintiff's prescription for Tramadol was not medically indicated. (*Id.*, ¶ 5.)

Nor does the evidence show that Defendants consciously disregarded a substantial risk to Plaintiff by failing to take reasonable steps to abate his complaints of pain. When Plaintiff complained of pain to Nurse Nakamura on June 8, 2009, the nurse promptly put in an order for Plaintiff to see the doctor. *See supra* at 4. Although Plaintiff claims that Nurse Nakamura was rude to him from June 8, 2009 to June 26, 2009, such verbal harassment alone is not sufficient to state a claim under § 1983. *See Freeman v. Arpaio*, 125 F.3d 732, 738 (9th Cir. 1997). There is no dispute that Nurse Nakamura continued to provide Plaintiff with his prescribed pain medication during this time and thereafter. Nor did Nurse Nakamura interfere with Plaintiff's

1   access to care as he again scheduled Plaintiff to see a doctor as requested on July 6, 2006. *See*

2   *supra* at 4.  In fact, Dr. Adam was notified of Plaintiff's complaints of pain on the same day.  *Id.*

3   The record also indicates when Nurse Nakamura brought Plaintiff his pain medication on July

4   14, 2009, Plaintiff refused to take it and refused to go to the clinic to be examined by Nurse

5   Nakamura.  *Id.*  Lastly, Plaintiff's allegation that Nurse Nakamura stated that he would "make

6   sure you don't get Tramadol anymore," *see supra* at 5, even if true, fails to show that Nurse

7   Nakamura was directly and unlawfully involved in the Defendant Doctors' decisions not to

8   prescribe Tramadol.

9          With respect to Dr. Adam, there is no evidence to show that she acted with deliberate

10  indifference to Plaintiff's needs.  When Plaintiff saw Dr. Adam on June 26, 2009, she noted

11  Plaintiff complained of back pain in the "low thoracic area" but that he still had good exercise

12  ability; Plaintiff admitted that he was currently doing 800 -100 pushups daily among other

13  exercises. (Mot., Ex. C at 1-2.)  Dr. Adam did not disregard Plaintiff's complaints of pain but

14  rather prescribed Ibuprofin upon the expiration of Tramadol.  *See supra* at 4.  There is nothing in

15  the record to indicate that her alternative solution in prescribing Motrin was unreasonable in

16  light of Plaintiff's condition at that time.  Nor is there any evidence to suggest that Dr. Adam

17  knew that Plaintiff would face an "excessive risk of harm" if she did not prescribe Tramadol.

18  When she was informed on July 6, 2009, that Plaintiff was experiencing further pain, she

19  promptly prescribed Tylenol 3 for seven days.  *See supra* at 5.  She later renewed the medication

20  on July 13, 2009, which Plaintiff refused to take.  (Mot., Ex. E.)  Lastly, when Dr. Adam saw

21  Plaintiff on July 17, 2009, she noted that he possessed good exercise ability, and therefore did

22  not believe that physical therapy or a referral to orthotics was necessary.  *See supra* at 5.

23  Notwithstanding Plaintiff's opinion to the contrary, this difference in opinion is not sufficient to

24  state an Eighth Amendment violation.  *See Franklin*, 662 F.2d at 1344.  Furthermore, Plaintiff

25  fails to show that Dr. Adam's choice of treatment was medically unacceptable under the

26  circumstances and that she chose this course "in conscious disregard of an excessive risk to

27  [P]laintiff's health."  *Jackson*, 90 F.3d at 332.  In fact, Plaintiff admits that from July through

28

1   September 2009, the prescribed medication helped him to walk and eased the pain somewhat,

2   albeit not completely.  (Compl., ¶ 65.)

3          Plaintiff's claim against Defendant Dr. Williams also fails because there is no evidence

4   that Dr. Williams acted with deliberate indifference to Plaintiff's medical needs.  Plaintiff first

5   saw Dr. Williams for his back and foot pain on February 25, 2010.  *See supra* at 5.  According to

6   Dr. William's examination notes, Plaintiff's vitals were normal, and he exhibited "no distress."

7   (Mot., Ex. I at 1.)  According to Plaintiff, when he requested Tramadol, Dr. Williams told him

8   that Tramadol and other narcotics were not given in the SHU pursuant to the policy from the

9   Chief Medical Officer.  (Compl., ¶ 69.)  Dr. Sayre states in his declaration that "there is no

10  policy that SHU inmates can never receive Tramadol."  (Sayre Decl., ¶ 4.)  Even if Dr. Williams

11  was misinformed about the existence of a prison policy denying Tramadol or other narcotics to

12  SHU inmates, there is no evidence indicating that Dr. Williams' alternative course of treatment in

13  prescribing Naprosyn and ordering x-rays was medically unacceptable under the circumstances.

14  According to Dr. Williams' declaration, "Naprosyn, along with other NSAID's such as Tylenol,

15  Ibuprofen, and Motrin, is administered to patients for both acute and chronic pain."  (C. Williams

16  Decl., ¶ 3.)  Furthermore, Plaintiff fails to show that Dr. Williams chose this course of treatment

17  - Naprosyn over Tramadol - with a conscious disregard of an excessive risk to Plaintiff, *i.e.*, that

18  he knew of and yet disregarded a substantial risk of serious harm to Plaintiff's health.  Lastly, the

19  x-rays revealed "unremarkable" findings and"no significant interval change" in Plaintiff's left

20  foot as compared to his last x-ray in April 2009, such that Dr. Williams reasonably concluded

21  that Plaintiff was receiving sufficient treatment.  (Mot., Ex. I.)

22         In opposition, Plaintiff relies on the medical records from CSP-Sacramento, indicating

23  that the medical personnel there had recommended physical therapy and a referral to an orthotics

24  specialist.  (Docket No. 34.)  The records also indicate that he had taken other ineffective pain

25  medication while at CSP, including Ibuprofen, Tylenol 3, and Naprosyn.  (*Id.*)  Nevertheless, a

26  showing of nothing more than a difference of medical opinion as to the need to pursue one

27  course of treatment over another is insufficient, as a matter of law, to establish deliberate

28

Order Granting Defendants' Motion for Summary Judgment
G:\PRO-SE\SJ.LHK\CR.10\Treglia502_grant-msj.hhl.wpd

1  indifference, *see Toguchi*, 391 F.3d at 1058, 1059-60; *Sanchez v. Vild*, 891 F.2d 240, 242 (9th

2  Cir. 1989); *Mayfield v. Craven*, 433 F.2d 873, 874 (9th Cir. 1970).

3       Accordingly, Dr. Adam, Dr. Williams, and Nurse Nakamura are entitled to summary

4  judgment as a matter of law on this claim. *See Celotex Corp.*, 477 U.S. at 323.

5       B.    Delay in Treatment

6       Plaintiff claims that Defendant Nurse Penkian acted with deliberate indifference by

7  delaying her response to his medical slip filed on April 19, 2010, and not seeing him until April

8  20, 2010.

9       In order for deliberate indifference to be established, there must be a purposeful act or

10  failure to act on the part of the defendant and resulting harm. *See McGuckin*, 974 F.2d at 1060;

11  *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985).[8]  A finding

12  that the defendant's activities resulted in "substantial" harm to the prisoner is not necessary,

13  however.  Neither a finding that a defendant's actions are egregious nor that they resulted in

14  significant injury to a prisoner is required to establish a violation of the prisoner's federal

15  constitutional rights, *McGuckin*, 974 F.2d at 1060, 1061 (citing *Hudson v. McMillian*, 503 U.S.

16  1, 7-10 (1992) (rejecting "significant injury" requirement and noting that Constitution is violated

17  "whether or not significant injury is evident")), but the existence of serious harm tends to support

18  an inmate's deliberate indifference claims, *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)

19  (citing *McGuckin*, 974 at 1060).

20       In his complaint, Plaintiff alleges that he first experienced the side effects of Naprosyn on

21  April 18, 2010. *See supra* at 7.  He admits that he did not notify prison officials until the next

22  day, on April 19, 2010, when he filed an "emergency" medical slip after he noticed dark looking

23

24       [8] Additionally, the defendant's actions must be the cause of the injury suffered by the
25  plaintiff. *Conn v. City of Reno*, 591 F.3d 1081, 1098 (9th Cir. 2010), *reinstated as modified by*
    658 F.3d 897 (9th Cir. 2011); *see id.* at 1098-1102 (reversing grant of summary judgment to
26  transporting police officers where children of pre-trial detainee who committed suicide presented
    evidence that transporting police officers (a) were subjectively aware the decedent was at acute
27  risk of harm (suicide); (b) failed to respond properly to that risk by informing jail officials; and
    (c) such failure was both the actual and proximate cause of the decedent's suicide once at the
28  jail).

1    blood in his stool *Id.* Plaintiff alleges that he complained of dizziness, lack of energy and

2    stomach pain in the medical skip. (Compl., ¶ 84.)  It is undisputed that Plaintiff saw Nurse

3    Penkian on April 20, 2010. (*Id.*, ¶ 84.)  According to Plaintiff, when Nurse Penkian asked

4    Plaintiff why he did not report his symptoms sooner, he insisted that he explained his condition

5    in the medical slip submitted the day before. (*Id.*)

6         Assuming that Plaintiff suffered some harm due to this one-day delay, his claim against

7    Nurse Penkian fails because there is no evidence that Nurse Penkian was the cause for the delay.

8    In order to show deliberate indifference, Plaintiff would have to show that Nurse Penkian

9    actually knew on April 19, 2010, that Plaintiff's condition constituted a substantial risk to his

10   health and that she nevertheless waited until the next day to provide care.  Plaintiff's insistence

11   that he mentioned his symptoms in the medical slip is irrelevant if Nurse Penkian was not

12   actually aware of it until the next day.  Notwithstanding Plaintiff's allegations that she is

13   covering up the alleged delay in her report, he provides no evidence linking Nurse Penkian to the

14   one day delay.  As he admits, his medical slip was picked up by an unidentified nurse, not Nurse

15   Penkian. (Compl., ¶ 83.) Plaintiff ultimately fails to show that Nurse Penkian knew about the

16   medical slip on April 19, 2010, from which she could have drawn the inference that an excessive

17   risk of harm existed. *See Farmer*, 511 U.S. at 837.  Accordingly, Nurse Penkian is entitled to

18   summary judgment on this claim as a matter of law. *See Celotex Corp.*, 477 U.S. at 323.

19         C.    Claims Against Defendants Dr. Sayre and Warden Lewis

20         Plaintiff alleges that Dr. M. C. Sayre is the Chief Medical Officer who implemented the

21   policy of not issuing Tramadol or "any other effective pain-relieving medication to inmates

22   housed in the SHU, including Plaintiff." (Compl., ¶ 70.)  Plaintiff also claims that he "has reason

23   to believe based on the circumstantial evidence of reports," that Dr. Sayre has "ordered all his

24   subordinates, Doctors and Nurses, to cover up inmates['] complaints by writing either false

25   diagnoses to make it appear the patient/inmate is either lying or twisting up the patients[']

26   complaints and minimizing them." (*Id.*)  Plaintiff relies on the his review of his medical files,

27   wherein he alleges a "pattern of Defendants Adam[], Nakamura, Williams and Penkian either

28   minimizing, omitting or switching Plaintiff's complaints to their advantage." (*Id.*)  Plaintiff

1    alleges that Defendant Warden Lewis is aware of Dr. Sayre's policy "to deny adequate pain

2    medication to inmates in the SHU" and has failed to take action to prevent it. (*Id.*, ¶ 72.)

3          First of all, as already mentioned above, Dr. Sayre states in his declaration that "[w]hile

4    long-term prescriptions for Tramadol are discouraged, there is no policy that SHU inmates can

5    never receive Tramadol." *See supra* at 11 (citing Sayre Decl., ¶ 4). Plaintiff's claim is factually

6    inaccurate, and without evidence to the contrary, Plaintiff's claim is without merit. Furthermore,

7    Plaintiff's allegation of a conspiratory cover-up is also without merit as conclusory allegations of

8    a conspiracy which are not supported by material facts are insufficient to state a claim under §

9    1983. *Woodrum v. Woodword County*, 866 F.2d 1121, 1126 (9th Cir. 1989). The

10   "circumstantial evidence of reports" to which Plaintiff aludes does not constitute "material facts"

11   to support this claim.

12         In opposition, Plaintiff claims that Dr. Sayre was deliberately indifferent for failing to

13   provide him with adequate pain medication. (Oppo. at 15.) Because Plaintiff does not allege

14   that Defendant Sayre was ever directly involved with his treatment, the only basis of liability

15   here is supervisor liability. A supervisor may be liable under section 1983 upon a showing of:

16   (1) personal involvement in the constitutional deprivation, or (2) a sufficient causal connection

17   between the supervisor's wrongful conduct and the constitutional violation. *Starr v. Baca*, 652

18   F.3d 1202, 1207 (9th Cir. 2011). Conversely, where there is no evidence that the supervisor was

19   personally involved or connected to the alleged violation, the supervisor may not be liable.

20   *See Edgerly v. City and County of San Francisco*, 599 F. 3d 946, 961-62 (9th Cir. 2010). Here,

21   Plaintiff has failed to provide evidence showing that Dr. Sayre was personally involved or

22   connected to the alleged violation. Furthermore, the Court has already determined that Dr.

23   Sayre's subordinates did not violate Plaintiff's constitutional rights with respect to the medical

24   treatment they provided. Accordingly, there is no basis for supervisor liability against Dr.

25   Sayre.[9]

26

27          [9] Plaintiff relies on a lawsuit filed by another inmate against Dr. Sayre for the denial of
28   Tramadol. (Oppo. at 6.) However, Dr. Sayre's actions with respect to the care of another inmate
     is irrelevant with respect to the issue of whether Dr. Sayre was personally involved in the alleged

1    For the same reason, there is no basis for supervisor liability against Warden Lewis.

2    Because Defendants have shown that there was no alleged "policy," it cannot be said that

3    Warden Lewis is liable for failing to take action against a non-existent policy.  In addition, other

4    than this allegation, (Compl., ¶ 72), Plaintiff makes no other factual allegations against Warden

5    Lewis indicating that Warden Lewis knew that Plaintiff faced a substantial risk of harm, and

6    consciously disregarded it by failing to take reasonable steps to abate it.  *See Farmer*, 511 U.S.

7    825, 837 (1994).  Nowhere in the complaint does Plaintiff allege that Warden Lewis was directly

8    involved with the decisions regarding Plaintiff's pain medication.  Accordingly, there is no basis

9    for liability against Warden Lewis.

10   IV.    Fourteenth Amendment Claim Against Defendant Dr. Willims

11   Plaintiff claims that Dr. Williams violated his Fourteenth Amendment right to due

12   process by failing to obtain his informed consent in prescribing Naprosyn.  (Compl., ¶ 99.)

13   The Due Process Clause of the Fourteenth Amendment protects individuals against

14   governmental deprivations of "life, liberty or property," as those words have been interpreted

15   and given meaning over the life of our republic, without due process of law.  *Board of Regents*

16   *v. Roth*, 408 U.S. 564, 570-71 (1972); *Mullins v. Oregon*, 57 F.3d 789, 795 (9th Cir. 1995).

17   Interests that are procedurally protected by the Due Process Clause may arise from two sources –

18   the Due Process Clause itself and laws of the states.  *See Meachum v. Fano*, 427 U.S. 215, 223-

19   27 (1976).  In the prison context, these interests are generally ones pertaining to liberty.

20   Changes in conditions so severe as to affect the sentence imposed in an unexpected manner

21   implicate the Due Process Clause itself, whether or not they are authorized by state law.  *See*

22   *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (citing *Vitek v. Jones*, 445 U.S. 480, 493 (1980)

23   (transfer to mental hospital), and *Washington v. Harper*, 494 U.S. 210, 221-22 (1990)

24   (involuntary administration of psychotropic drugs)).  A state may not impose such changes

25   without complying with minimum requirements of procedural due process.  *See id.* at 484.

26

27   ─────────────

28   constitutionally deficient medical treatment provided to Plaintiff.

1    Deprivations that are authorized by state law and are less severe or more closely related

2 to the expected terms of confinement may also amount to deprivations of a procedurally

3 protected liberty interest, provided that (1) state statutes or regulations narrowly restrict the

4 power of prison officials to impose the deprivation, i.e., give the inmate a kind of right to avoid

5 it, and (2) the liberty in question is one of "real substance." *See id.* at 477-87.  Generally, "real

6 substance" will be limited to freedom from (1) a restraint that imposes "atypical and significant

7 hardship on the inmate in relation to the ordinary incidents of prison life," *id.* at 484, or (2) state

8 action that "will inevitably affect the duration of [a] sentence," *id.* at 487.

9    A court presented with a procedural due process claim by a prisoner should first ask

10 whether the alleged deprivation is one so severe that it implicates the Due Process Clause itself

11 or one less severe that implicates an interest created by state statute or regulation.  If the

12 deprivation implicates an interest created by state statute or regulation, the court must next ask

13 whether the applicable state statute or regulation narrowly restricts the power of prison officials

14 to impose the deprivation, *Bonin v. Calderon*, 77 F.3d 1155, 1161-62 (9th Cir. 1996) (looking

15 first to statutory language and finding no state created constitutionally protected interest in

16 choosing method of execution because state statute does not guarantee prisoner choice).

17    Plaintiff claims that Sections 3351, 3353, and 3351.1 of Title 15 of the California Code

18 of Regulations give him the "state created liberty to accept, refuse, and make an informed

19 consent." (Compl., ¶ 98.)  Defendants argue that section 3351 refers to inmate refusal of

20 treatment and is therefore not applicable, and that section 3351.1 does not exist. (Mot. at 12, n. 2

21 & 3.)  Section 3353 requires that a written informed consent be obtained when "unusual, serious,

22 or major health care procedures are indicated." (*Id.*, at 12.)  Defendants first assert that Plaintiff

23 cites no legal authority stating that the right to informed consent for a prescription of pain

24 medication is a liberty interest protected under the Fourteenth Amendment, and that they have

25 found no authority indicating so. (*Id.*)  Furthermore, Defendants argue that the prescription of

26 pain medication is not an "unusual, serious, or major procedure" requiring written informed

27 consent under Section 3353, and therefore does not apply to Plaintiff's situation. (*Id.*)

28

1  Because Plaintiff is asserting a liberty interest created by state statute, *i.e.*, by Section

2  3353, the next step is determining whether the applicable state statute or regulation narrowly

3  restricts the power of prison officials to impose the deprivation.  *See Bonin*, 77 F.3d at 1161-62.

4  As Defendants point out, this section requires that prison officials obtain informed written

5  consent when an inmate faces health care procedures that are "unusual, serious or major" and

6  "except as otherwise provided in Sections 3351 and 3364."  Cal. Code Regs. tit. 15 § 3353.

7  Section 3351 provides that a mentally, competent inmate may refuse health care treatment,

8  including medication, and Section 3364 authorizes the administration of medication to an inmate

9  with a mental disease without first obtaining consent in narrow circumstances.  *Id.*  Clearly, these

10  state regulations have created a right of a mentally competent inmate to accept or refuse

11  treatment, and that they be required to give written consent for procedures that are "unusal,

12  serious, or major."

13  The next question for the case at bar is whether a prescription for pain medication like

14  Naprosyn is such an "unusual, serious, or major" health care procedure that it requires written

15  consent under Section 3353.  Dr. Williams states in her declaration that Naprosyn is a

16  "commonly administered non-steroidal anti-inflammatory drug (NSAID)," which along with

17  other NSAIDs such as Tylenol and Ibuprofen is "administered to patients for both acute and

18  chronic pain."  (Williams Decl., ¶ 3.)  The potential side effects of Naprosyn are "abdominal

19  pain, dizziness, nausea, blood in vomit, and black tarry stool."  (*Id.*)  It is undisputed that

20  Plaintiff has been taking pain medication for his chronic pain for several years, including other

21  NSAIDs such as Tylenol and Ibuprofen, as well as Rabaxin, Tylenol 3, Methocarbamoral,

22  morphine sulfate and Elavil.  *See supra* at 2.  At PBSP, the record shows that Plaintiff frequently

23  took Motrin and Tylenol 3.  *Id.* at 4, 6.  Dr. Williams states that the potential side effects of

24  Ibuprofen consist of "upset stomach, nausea, vomiting, headache, diarrhea, constipation, and

25  dizziness," with more serious side effects involving "easy bruising/bleeding, hearing changes,

26  mental/mood changes, swelling of the ankles/feet/hands, suddent weight gain, stiff neck, change

27  in amount of urine, and vision changes."  (Williams Decl., ¶ 5.)  Despite these varied side

28  effects, it appears that Motrin was frequently prescribed to Plaintiff without requiring a written

1   informed consent.  *See supra* at 4, 6 and 8.  Accordingly, the Court is not convinced that a

2   prescription for another NSAID - Naprosyn - was so "unusual, serious, or major" as compared to

3   Tylenol and Motrin, such that Section 3353 applies to require his written consent.  Plaintiff fails

4   to show that Dr .Williams violated his Fourteenth Amendment right by allegedly failing to

5   provide him the procedural protections under Section 3353 because the requirement for written

6   consent does not apply to his situation.  Dr. Williams is entitled to summary judgment as a

7   matter of law on this claim.  *See Celotex Corp.*, 477 U.S. at 323.

8   V.      Remaining Claims and Unserved Defendants

9           A.      State Law Claims

10          Plaintiff's remaining claims are based on state law, *e.g.*, negligence, medical malpractice,

11  and strict liability.  Defendants argue that the Court should dismiss all the state law claims

12  should it dismiss all the federal claims agains them.

13          The Court has discretion under 28 U.S.C. § 1367(c) to adjudicate or to dismiss the

14  remaining state law claims when it has dismissed all claims over which it has original

15  jurisdiction.  *See Ove v. Gwinn*, 264 F.3d 817, 826 (9th Cir. 2001) (court may decline to exercise

16  supplemental jurisdiction over related state-law claims under subsection (c)(3) once it has

17  dismissed all claims over which it has original jurisdiction.)  Plaintiff's state claims are based on

18  the same set of facts as his federal claims, which the Court has dismissed above.  Accordingly,

19  the Court declines to exercise jurisdiction over the remaining state law claims, and will dismiss

20  these claims without prejudice.  *See Reynolds v. County of San Diego*, 84 F.3d 1162, 1171 (9th

21  Cir. 1996).

22          Accordingly, Plaintiff's state claims against all Defendants are DISMISSED without

23  prejudice to Plaintiff  bringing these claims in state court.  Furthermore, unserved Defendant

24  Glenmark Generics, Inc., is DISMISSED from this action as Plaintiff's claims against this

25  Defendant are based soley on state tort law.

26          B.      Claims against Unserved Defendant Matthew Cate

27          Plaintiff's sole allegation against unserved Defendant Matthew Cate is that as the

28  secretary of CDCR, he is "legally responsible for the overall operation of CDCR and each

1  institution under its jurisdiction, including PBSP." (Compl., ¶ 3.) Plaintiff makes no allegation
2  that Secretary Cate was directly involved with the decisions regarding Plaintiff's treatment.
3  Furthermore, under no circumstances is there respondeat superior liability under section 1983.
4  Or, in layman's terms, under no circumstances is there liability under section 1983 solely because
5  one is responsible for the actions or omissions of another. *See Taylor v. List*, 880 F.2d 1040,
6  1045 (9th Cir. 1989); *Ybarra v. Reno Thunderbird Mobile Home Village*, 723 F.2d 675, 680-81
7  (9th Cir. 1984). Accordingly, the claim against Defendant Cate is DISMISSED for failure to
8  state a claim.

9  VI.   Pending Motions

10       Plaintiff filed a motion for "clarification of orders," requesting confirmation that his
11  opposition was received by the Court. (Docket no. 39.) Since Plaintiff thereafter filed additional
12  papers indicating that he is aware that the Court received his opposition, (see Docket no. 44), the
13  motion is DENIED as moot.

14       Plaintiff filed a motion to compel discovery on November 23, 2011, after Defendants'
15  motion for summary judgment became submitted on July 22, 2011. (Docket no. 40.) The
16  motion to compel discovery is DENIED as moot by this order.

17

18                                    **CONCLUSION**

19       For the foregoing reasons, Defendants M. C. Sayre, Warden Lewis, Dr. Nancy Adam,
20  Nurse Steve Nakamura, Dr. Claire Williams, and Nurse Stella Penkian's motion for summary
21  judgment is GRANTED.[10] (Docket no. 32.) The state claims against them and Defendant James
22  Cipolla are DISMISSED without prejudice to Plaintiff bringing these claims in state court.

23       The state claims against unserved Defendant Glenmark Generics, Inc., are DISMISSED
24  without prejudice to Plaintiff bringing these claims in state court. The claims against unserved
25  Defendant Matthew Cate are DISMISSED for failure to state a claim. The Clerk shall terminate
26  these Defendants from this action.

27  _____

28       [10] Thus, the Court finds it unnecessary to address Defendants' argument that they are
     entitled to qualified immunity

1     The Clerk shall terminate all pending motions and close the file.

2     IT IS SO ORDERED.

3 DATED: 3/22/12

4                                          LUCY H. KOH
                                           United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28